UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARY HATCH and KEITH HENDERSON,<br>    *Plaintiffs*,<br>    *v.*<br>MEGAN J. BRENNAN, POSTMASTER GENERAL,<br>    *Defendant*. | Civil No. 3:16cv795 (JBA)<br><br>July 13, 2018 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Mary Hatch and Keith Henderson allege against Defendant Megan J. Brennan, the Postmaster General, that Defendant discriminated against Plaintiffs based upon their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Counts One and Two), as well as on the basis of perceived disability in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (Counts Three and Four), and that Defendant retaliated against Plaintiffs in violation of Title VII, 42 U.S.C. § 2000e (Counts Five and Six).[1] Defendant now moves [Doc. # 55] for summary judgment on all claims. Oral argument was held April 20, 2018. For the following reasons, Defendant's Motion is granted.

**I.    Background**

Plaintiffs Mary Hatch and Keith Henderson worked as human resources specialists for the United States Postal Service ("USPS") in the Connecticut Valley District—Hatch beginning in 1985

---

[1] Plaintiffs' Complaint alleges retaliation in violation of Title VII, but the facts they allege actually support a claim that they were subject to retaliation on account of their opposition to disability discrimination. Defendant treated Plaintiffs' retaliation claims as pled under the Rehabilitation Act in its Motion for Summary Judgment, and at argument Plaintiffs represented that their retaliation claims are pled under the Rehabilitation Act. Accordingly, the Court analyzes Plaintiffs' relation claims under the Rehabilitation Act, notwithstanding Plaintiffs' references to Title VII.

and Henderson in 1979. (Def.'s Loc. R. 56(a)1 Stmt. ¶ 1 ("Def.'s LR 56 Stmt"); Pl.'s Loc. R. 56(a)2 Stmt. ¶1 ("Pl.'s LR 56 Stmt").)[2] During the relevant time period, Plaintiffs were employed in the "Learning Development and Diversity" ("LD&D") Unit. (LR 56 Stmt. ¶ 2.) Beginning January 2014, through their respective retirements, Plaintiffs' supervisor in the LD&D Unit was Catherine Litke. (*Id.* ¶ 3.)

### A. Working Under Litke

Hatch testified that Litke was rude, insulting, and berating, and spoke "down" to her and numerous other employees. (Hatch Tr. at 59:24-60:17.) Henderson experienced Litke condescendingly talking to him as if he were a "two-year old" or "a young child" on a consistent basis. (Henderson Tr. at 56:1-57:10.) Both Plaintiffs wrote on their respective EEO Investigative Affidavits[3] that Litke spoke to them in "demeaning, insulting, berating manner in front of colleagues and others." (*See, e.g.*, Ex. C (Hatch EEO Aff.) to Def.'s Mot. for Summ. J. [Doc. # 55-3] at 76; Ex D (Henderson EEO Aff.) to *id.* [Doc. # 55-4] at 105.)

Plaintiffs further stated that Litke routinely imposed completely unreasonable deadlines for the projects she assigned to Plaintiffs. (Hatch Tr. at 32:24-33:2; Henderson Tr. at 29-33, 136.) Henderson found that Litke would demand that he be able to deliver more work than was possible in the given time frame, and that when he advised her that her timeframe expectations were unrealistic, she informed him she did not like his attitude and it would have to change, and he

---

[2] Where Plaintiff admits the facts set forth in Defendant's Local Rule 56(a)1 Statement, the Court refers to the parties' Local Rule Statements together as "LR 56 Stmt."

[3] Plaintiffs' initial EEO contact took place on May 27, 2015. (LR 56 Stmt. ¶ 33.) Hatch's EO Investigative Affidavit was signed October 7, 2015 and Henderson's October 9, 2015. (*See* Exs. C and D to Def.'s Mot. for Summ J.) Neither Plaintiff had previously filed any EEO complaint, formal or informal. (LR 56 Stmt. ¶ 31.)

would have to work harder. (Henderson Tr. at 28:12-29:4.) Plaintiffs both testified that, in contrast, Litke took projects away from younger employees when they complained of being overwhelmed. (Hatch Tr. at 115:8-16; Henderson Tr. at 145:1-4.)

Hatch claims that Litke threatened her with discipline in nearly every conversation (Hatch Tr. at 63:15-21), and that "the threat was hanging over [her] head constantly" (*id.* at 65:7-8). Similarly, Henderson was constantly threatened with disciplinary action by Litke when he complained to her about his workload. (Henderson Tr. at 65.) Moreover, although denied by Litke, Plaintiffs assert that Litke would frequently ask them to stay beyond their scheduled departure time, without the benefit of compensation. (Hatch Tr. at 67:14-22; Henderson Tr. at 125:23-126:11, 1281-129:8; Litke Tr. at 88:13-25.)[4]

After coming under Litke's supervision, Plaintiff Hatch experienced severe headaches, anxiety, depression, inability to concentrate, sleeplessness, exhaustion, nightmares, and neck pain. (LR 56 Stmt. ¶ 9.) Henderson testified that as a result of the treatment he received from Litke and other managers, he developed a diagnosed general anxiety disorder. (Henderson Tr. at 38:1-11.) He also testified that he suffered from "extreme stress." (*Id.* at 42:6-12.)

**B. Hatch's Form 3971 and Letter of Warning**

Hatch submitted to Litke a Request for Absence (a "Form 3971") for 1.5 hours of leave time, dated January 8, 2015, on which she wrote under "remarks[:]" "STRESS/ HARASSMENT/HOSTILE WORK ENVIRONMENT FOR THE PAST YEAR." (Ex. 7 (Form

---

[4] Plaintiffs also contend that Henderson found unflattering notes prepared by Litke about Hatch and himself on a shared printer in the LD&D Unit. (Hatch Tr. at 68:5-10; Henderson Tr. at 70:6-16.) Henderson testified that he could not remember the substance of the notes, and that he gave them to Hatch. (Henderson Tr. at 71:2-13.) Hatch no longer has the notes and could not recall what happened to them, but speculated they may have shredded them. (Hatch Tr. at 68:11-17.)

3971) to Pl.'s Opp'n.) Litke gave the Form 3971 to her manager, Ms. Theresa Bruso, but neither Litke nor Bruso took any substantive, affirmative steps regarding Hatch's claim of harassment and hostile work environment. (Litke Tr. at 16:4-16; Hatch Tr. at 75:11-17.)

On January 20, 2015, Litke issued a Letter of Warning to Hatch regarding Hatch's failure to provide a certain report by the requested deadline. (*See* Ex. 15 (Hatch Warning Letter) to Pl.'s Opp'n [Doc. # 59-6]; Ex. E to Def.'s Mot. for Summ. J.) Hatch, who in the previous thirty years of employment had a completely exemplary and unblemished disciplinary record, found this action deeply insulting and punitive. (*See* Hatch Tr. at 90:18-23.)

On January 30, 2015, Hatch responded to the Letter of Warning with a letter to Litke, addressed "To whom it may concern," comprehensively explaining why the project had not been completed as requested. (*See* Ex. 8 (Hatch Response Letter) to Pl.'s Opp'n.) Hatch ended her letter, "[t]he fact of the matter is we are drowning in a sea of constant chaos, bullying, harassment, ineffective and unknowledgeable micromanagement and demeaning monologues that have eroded our reputation, confidence, and ability to maintain the level of excellent service we have always provided. . . ." (Hatch Response Letter at 3.)

In the meantime, both Plaintiffs left work on sick leave, neither of whom would ever return to work, and instead retired. Hatch's last day of work was January 20, 2015. (Ex. C (Hatch EEO Aff.) to Def.'s Mot. for Summ. J. [Doc. # 55-3] at 110.) Similarly, Henderson was out on sick leave beginning January 22, 2015 "due to the hostile work environment [he] was subject to." (Ex D (Henderson EEO Aff.) to Def.'s Mot. for Summ. J [Doc. # 55-4] at 130.)

## C. The Joint Complaint

While out on sick leave, Plaintiffs authored a joint letter of complaint (the "Joint Complaint") dated February 20, 2015, notifying the Postal Service's management about the

working conditions and seeking intervention because Plaintiffs "couldn't live and survive in that kind of environment and do the amount of work" required of them. (Hatch Tr. at 69:2-21; Ex. 6 (the Joint Complaint) to Pl.'s Opp'n.) The Joint Complaint listed twenty-nine examples of the treatment Plaintiffs characterized as "daily bullying, harassment, humiliation, intimidation and demeaning aggression the manager displayed against" them. (Joint Complaint at 4364.) However, it makes no mention of any disability or impairment, nor does it refer to or imply differential treatment on the basis of age, disability, or prior EEO activity. (Def.'s LR 56 Stmt. ¶¶ 6-8.) Moreover, the Joint Complaint states that it would be "fair to say that [Plaintiffs were] not the only victims of [Litke's] wrath, but that everyone in the department, and well beyond, have suffered from her irrational and hostile behavior as well." (*Id.*)

Bruso received the Joint Complaint from Jim Bachteler, the National Association of Postal Supervisors ("NAPS") advocate acting on behalf of Plaintiffs. (Bruso Tr. at 1-12; Ex. 9 (Bachteler Email) to Pl.'s Opp'n at 5308.) Bachteler's email noted that he was "filing a Hostile Workplace compliant [sic] against the Manager of LD&D Cathy Litke." (Bachteler Email at 5308.) Finding the Joint Complaint to be serious, Bruso brought it to the attention of Andrew Cullen, who was Bruso's manager of labor, in the middle of March, 2015. (Bruso Tr. at 42:11-16; Cullen Tr. at 51:19-20.)[5]

Bruso testified that she decided to remove herself from direct involvement because Litke reported directly to her, and that she therefore asked Cullen to take the lead on investigating the Complaint. (Bruso Tr. at 42:15-20.) Cullen proceeded with "an informal investigation to make the

---

[5] The Joint Complaint was initially discussed between Bruso, Cullen and Christina Sousa (sometimes referred to as Ms. Brock), who was head of the Threat Assessment Team, in order to make a determination as to whether there was any need for immediate action, such as separating the parties from each other. (Cullen Tr. at 51:6-13, 52:8-22.)

determination if" it was necessary "to proceed with a more formal investigation." (Cullen Tr. at 58:10-12.)[6]

In conducting his informal investigation, Cullen believed it was more beneficial not to let Bruso and Litke know they were being examined, as they would, presumably, be more apt to speak candidly.[7] (*Id.* at 59:5-10, 78:6-10.) Consequently, Cullen spoke to Bruso and Litke on "unrelated issues" in order to determine whether the assertions raised by Hatch and Henderson in the Joint Complaint warranted closer scrutiny. (*Id.* at 59:11-60:6.) He did ask Litke about working with Plaintiffs, and was informed that Hatch could be difficult to work with and Henderson essentially followed what Hatch did. (*Id.* at 78:14-79:5.) Cullen testified that in his view, "it wasn't necessarily whether [Litke's statements] were true or not" but rather "how [Litke] said it," i.e., he wanted to see if Litke spoke in a condescending manner or in a way that Cullen felt belittled Plaintiffs. (*Id.* at 79:8-12.) He further stated: "You know, if I get the eyes rolling or if I get the disgusted tone in someone, that's what I was looking for when I met with [Litke], to see if she had that about [Plaintiffs]. She didn't act that way," from which he concluded "that she didn't have a level of disdain for them." (*Id.* at 79:17-24.) He clarified this fact alone did not mean harassment had not occurred but was one of the factors he took into consideration. (*Id.* at 79:25-80:4.)

He also spoke with Walkden and Zaskey, two other Human Resource Specialists within the LD&D Unit who reported to Litke. (*Id.* at 63:15-66:21.) However, over the course of his three to

---

[6] There are guidelines with respect to how a formal investigation is conducted, but not informal. (Cullen Tr. at 57:20-58:1.)

[7] In fact, neither Bruso nor Cullen advised Litke that a Joint Complaint had been authored by Hatch and Henderson against her; Litke learned of this fact through her attorney after this case was filed. (Litke Tr. at 117:4-8, 120:7-121:2.)

four week informal investigation, Cullen never spoke to either Hatch or Henderson because he did not think it was necessary. (*Id.* at 68:4-9, 80:15-20.) Cullen testified that he had not been aware of Hatch's 3971 Form during his investigation. (*Id.* at 108:2-3.)

Cullen ultimately determined that harassment never occurred between Litke and Hatch and Henderson in the workplace. (*Id.* at 66:22-25.) He considered the circumstances as a whole based on his investigation, noting that Hatch was passed over for the management job Litke received, the outgoing manager was very well-liked and had a different personality and management style, Henderson had had attendance issues, and Plaintiffs' complaints were not made contemporaneously with the underlying events. (Cullen Tr. at 69:1-73:17.) He also concluded that there could "possibly" be some resentment on the part of Plaintiffs toward Litke. (*Id.* at 76:1-10.)

Plaintiffs never received any response to their Joint Complaint, and each testified that they felt forced to retire as a result of this lack of response. (Hatch Tr. at 73:13-24; Henderson Tr. at 80:23-81:25.) Bruso opined that only when an investigation of harassment/hostile work environment becomes formal, which it did not here, does the Complainant need to be notified of the results. (Bruso Tr. at 48:21-49:6.)

### D. Communications While Plaintiffs Were on FMLA Leave

Hatch received a letter dated February 27, 2015 from Litke advising her of a scheduled pre-disciplinary interview to discuss her "continued absence since February 10, 2015" and notifying her that her "absence since that date ha[d] been designated as AWOL." (Ex. 19 (Pre-Disciplinary Interview Letter) to Pl.'s Opp'n [Doc. # 59-6].) The letter further indicated that discipline, including potential removal from the Postal Service, was being considered. (*Id.*) Hatch emailed

Litke on March 1, notifying Litke she had faxed and sent hard copies of the latest FMLA paperwork covering the period of January 21 through March 9, 2015 to Shared Services. (Ex. 20 (Hatch-Litke FMLA Emails) to Pl.'s Opp'n [Doc. #59-6].) Litke responded that Hatch's FMLA was approved only through February 9, 2015, and that she had previously sent a letter to Hatch instructing her to submit documentation, which she failed to provide, resulting in her continued absence since February 10, 2015 being designated as AWOL. (*Id.*) Hatch felt these letters were a way for Litke to harass her. (Hatch Tr. at 129:12-21.)

Subsequently, Litke issued Plaintiff Henderson a Letter of Warning dated May 22, 2015, for "failure to be in regular attendance."[8] (*See* Ex. F to Def.'s Mot. for Summ. J; Ex. 13 to Pl.'s Opp'n.) It stated that Henderson had been absent from position since April 17, 2015 on sick leave and that his record ". . . reveals a lack of dependability in maintaining [his] work schedule." (*Id.*) Although Henderson was out of work in accordance with his physician's orders, Litke believed his time was no longer FMLA protected, which pursuant to Postal Service Policy, is a violation of the Employee and Labor Relations Manual ("ELM"). (Litke Tr. at 110:6-113:25.) Henderson appealed the decision, but his appeal was denied and the Letter of Warning remained on his record. (Ex. 16 (Henderson Appeal) to Pl.'s Opp'n; Ex. 17 to *id.*)[9]

---

[8] Bruso also approved this letter, although the decision was first made by Litke. (Litke Tr. at 110:11-24.)

[9] In the denial of his appeal, Bruso noted that although the fact that Henderson provided documentation relevant to his absence supports the approval and pay of sick leave, this does not excuse Henderson's obligation to maintain his assigned schedule. (Ex. 17 to Pl.'s Opp'n.)

On June 25, 2015 Cullen sent a letter to Henderson requesting certain medication information from his treating physician in response to Henderson's request for accommodation. (Ex. 14 (Reasonable Accommodation Letter) to Pl.'s Opp'n.) After Henderson supplied this documentation he attended one District Reasonable Accommodation Committee ("DRAC") meeting on August 2015.[10] (Henderson Tr. at 17:7-12, 20:9-11.) He testified that at that meeting Cullen, also the head of the DRAC, asked what the Postal Service could do to get him back to work, to which Henderson responded that he could not make that determination until he found out the results of his hostile workplace complaint. (*Id.* at 17:22-18:4.) He asserts that Cullen stated he had not been aware Henderson filed a complaint, but had thought Henderson was just backing up Hatch. (*Id.* at 18:5-9.) He then promised to get back to Henderson regarding that complaint. (*Id.* at 18:11-13.) The United States Postal Service never followed up with regard to a reasonable accommodation nor did Henderson ever hear from Cullen regarding the Joint Complaint. (*Id.* at 19:23-20:8.)

Hatch officially retired April 30, 2015[11] although she had planned on working until June 2018. (Ex. C (Hatch EEO Aff.) to Def.'s Mot. for Summ. J. [Doc. # 55-3] at 110.) Henderson remained out of work until he retired on May 31, 2016. (Henderson Tr. at 94:21-23). Henderson testified he would not have retired but he ran out of sick leave and "couldn't return to an environment that [he] felt was hostile and detrimental to [his] physical and mental health." (Henderson Tr. at 81:1-3.)

---

[10] Plaintiffs and their medical providers sent medical notes to the USPS medical unit, which is separate from LD&D. (LR 56 Stmt. ¶¶ 22-23.)

[11] She testified that her application to retire was submitted March 19, 2015. (Hatch Tr. at 98:2-7.)

### E. Facts Related to Plaintiffs' Age and Disability Status

Plaintiff Hatch identified three comparator employees for Plaintiffs' age discrimination claims, Michael Berghuis, Lori Zaskey, and Millie Cooke, but did not know their ages. (Hatch Tr. at 15:20-16:3.) Henderson also identified Berguis and Zaskey, but instead of Cooke, identified Nancy Walkden. (Henderson Tr. at 22:9-22.) According to Henderson, Berghuis and Walkden are in their fifties, and Zaskey is in her late 30s or 40s. (LR 56 Stmt. ¶ 47.) Catherine Litke did not know the ages of these employees, but based on her observation they "may be younger" than Hatch and Henderson. (Litke Tr. at 31:11-33:4.) Litke is one year younger than Keith Henderson and eight years younger than Mary Hatch is. (*Id.* ¶ 48.) Litke believed she and Hatch were in the same age group because they discussed retirement prior to Litke becoming Hatch's supervisor. (Litke Tr. at 15:7-19.)

Litke and the other principals have not made any remarks showing age animus. (LR 56 Stmt. ¶ 37.) As to Andrew Cullen and Teresa Bruso's handling of the Joint Complaint, Plaintiff Hatch testified, "I can't sit here right now and say definitely that was age discrimination, but why else wouldn't they respond? I mean, I just couldn't -- I don't want to speculate, because I don't know." (LR 56 Stmt. ¶ 38.)

With respect to disability claim comparators, Plaintiffs do not know the disability status of any of them. (LR 56 Stmt. ¶ 29.) Litke, Bruso, and Cullen all testified that they did not know Plaintiffs' respective disability statuses in the relevant time frame. (*See* Exhibit K (EEO Affidavit of Catherine Litke re Hatch) to Def.'s Mot. for Summ. J. at 3; Exhibit L (EEO Affidavit of Catherine

Litke re Henderson) to *id.* at 2; Exhibit I (Bruso Tr.) to *id.* at 113 (Henderson), 117-18 (Hatch);

Exhibit N (EEO Affidavit of Andrew Cullen re Henderson) to *id.* at 5.) Litke and the other

principals have made no remarks showing disability animus. (LR 56 Stmt. ¶ 28.)

## II.    Discussion

### A.    Plaintiffs' Rehabilitation Act Claims

The Rehabilitation Act prohibits disability-based discrimination in federal employment.

The standards from the Americans with Disabilities Act ("ADA") are applied to the Rehabilitation

Act in the employment context, including the three-step burden-shifting framework established

in *McDonnell-Douglas Corp. v. Greene*, 411 U.S. 792 (1973). *See, e.g., Harris v. Mills*, 572 F.3d 66,

73–74 (2d Cir. 2009); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187

(2d Cir. 2015).

To make out a prima facie case under the Rehabilitation Act, a plaintiff must establish the

following elements: 1) his employer is subject to the Act; 2) the plaintiff has, or is perceived to have,

a disability within the meaning of the Act; 3) the plaintiff was capable of performing the essential

functions of the job with reasonable accommodation; and 4) the plaintiff was subjected to an

adverse employment action because of the disability. *Reeves v. Johnson Controls World Services,*

*Inc.*, (2d Cir. 1998), 140 F .3d 144, 149-150; *see also Ryan v. Grae & Rybicki, Pc.*, 135 F.3d 867, 869-

870 (2d Cir. 1998). Plaintiff's burden of setting out a prima facie discrimination case is "minimal."

*See, e.g., McPherson v. New York City Dept. of Education*, 457 F.3d 211, 215 (2d Cir. 2006); *see also*

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) ("burden at the prima facie

stage often is described as de minimis").

Defendant argues that Plaintiffs' prima facie case fails at the second and fourth prongs because they have not shown that they were perceived as disabled within the meaning of the Act,[12] and they lack evidence demonstrating that their forced retirements or any other adverse actions were the result of discrimination on the basis of disability.[13]

### 1. Whether Plaintiffs Were Regarded as Being Disabled

In a "regarded as" or perceived disability discrimination claim, a plaintiff "need only demonstrate that the employer regarded [her] as impaired, whether or not that impairment is believed to limit a major life activity." *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 200 (D. Conn. 2013) (citing *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012)); *see also* 42 U.S.C. § 12102(3)(A)).[14] The parties agree that there is no direct evidence any of the USPS managers viewed Plaintiffs as being disabled—the managers did not say anything disparaging about persons with disabilities, nor did they make any reference to Plaintiffs having any impairment. (*See* Hatch Tr. at 32; Henderson Tr. at 86.)

---

[12] Plaintiffs clarified at oral argument that they do not claim they were actually disabled, despite contrary indications in their Opposition Brief.

[13] Defendant does not dispute that it is covered by the Rehabilitation Act, nor that Plaintiffs could perform the essential functions of their jobs.

[14] This more lenient standard was codified by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 112 Stat. 3553 (2008) (codified as amended at 42 U.S.C. §§ 12101-12102 (1990)). Previously a plaintiff who alleged he or she was "regarded as" having a disability was required to show that the perceived disability was one that "substantially limited a major life activity. *See, e.g., Gentleman v. State Univ. of New York-Stony Brook*, No. 16-CV-2012(ADS)(AKT), 2017 WL 2468963, at *4 (E.D.N.Y. June 6, 2017).

Plaintiffs argue that an inference that Defendant viewed Plaintiffs as being impaired can be drawn from the fact that they each took substantial leave prior to being forced into retirement. Both Plaintiffs took leave in late January 2015, with Hatch's last day of work on January 20, and Henderson's last day on January 21. They remained out on leave until their "forced" retirements—April 30, 2015 for Hatch, and May 31, 2016 for Henderson.

According to Plaintiffs, the fact that Cullen convened a meeting of the DRAC for August 26, 2015, and then immediately canceled it after learning that Henderson had also made a harassment/hostile work environment complaint is evidence that management perceived Henderson as having a disability. (Pl.'s Opp'n at 18.)[15] With respect to Hatch, Plaintiffs note that Litke was clearly monitoring the status of the medical documentation Hatch filed in support of her requested leave, to the point of scheduling a pre-disciplinary hearing because all of Hatch's FMLA paperwork had not been accepted by Shared Services. They therefore maintain that the record supports an inference that Litke perceived Hatch as having a mental and/or physical disability. (Id.)[16]

Even taking the factual record in the light most favorable to Plaintiffs, the Court finds no probative evidence from which an inference can reasonably be drawn that Defendant regarded Plaintiffs as being impaired. Plaintiffs do not specify even what impairment, mental or physical,

---

[15] The record is not clear as to exactly how this meeting came about, but the letter from Cullen as head of the DRAC clearly states that it requests medical documentation in response to Henderson's "request for accommodation."

[16] Plaintiffs contend that in light of both the Form 3971 and the Joint Complaint one can infer that the Postal Service's management perceived Hatch as disabled. (Pl.'s Opp'n at 19.) However, neither of these documents expressly mention disability, nor could be understood as referring to any disability.

they claim Defendant perceived Plaintiffs to have been suffering from. The fact that Litke and other management knew Plaintiffs had been out on sick leave for extended periods of time, is not on its own, sufficient to support an inference that Defendant regarded Plaintiffs as being disabled.

### 2. Whether the Adverse Employment Actions Were the Result of Disability Discrimination[17]

"A plaintiff may either offer direct evidence of discriminatory intent, or may offer indirect evidence to raise an inference of discriminatory intent." *Hongmei Li v. Cushman & Wakefield, Inc.*, No. 16CV2484 (DLC), 2017 WL 1740440, at *5 (S.D.N.Y. May 3, 2017). As discussed above (*supra* at 12-13), there is no direct evidence Defendant perceived Plaintiffs as disabled. The evidence in the record is also insufficient to support an inference that the adverse employment actions were motivated by discriminatory disability animus.

An inference of discriminatory animus may be raised where a plaintiff demonstrates that "that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotations and citations omitted). The plaintiff must be able to show that there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id.* Here, because Plaintiffs do not know the disability status of any of their comparators (LR 56 Stmt. ¶ 29), no inference of discrimination can be drawn from the fact that other employees were not subject to adverse actions or harassment.

---

[17] The unchallenged adverse action prong of the prima facie case is primarily Plaintiffs' claimed constructive discharge through involuntary early retirement. Plaintiffs also claim that the letters of warning constitute adverse employment actions.

In addition, Plaintiffs contend that Defendant's failure to adequately investigate their Joint Complaint or to take any responsive remedial steps, is sufficient to establish an inference of discriminatory intent based upon Defendant's perception that Plaintiffs were disabled.[18] However, their Joint Complaint contains no mention of disability that could warrant such an inference. Plaintiffs also focus on the February 27 letter Litke sent Hatch threatening discipline or removal from the Postal Service based upon the fact that her FMLA paperwork had not been accepted. (*See* Ex. 19 to Pl.'s Opp'n; Litke Tr. at 132:14-25.) While Hatch testified that she felt this was a form of harassment, Plaintiffs point to no evidence that Hatch's documentation had in fact been properly submitted, nor do they otherwise suggest that Litke's letter was sent with unlawful discriminatory intent.

On this record, the Court finds there is simply insufficient evidence that Plaintiffs can meet their prima facie burden to demonstrate that the adverse employment actions Plaintiffs suffered were because of Defendant's perception of them as disabled. Because Plaintiffs cannot prevail on their Rehabilitation Act claims, they must be dismissed.[19]

---

[18] Defendant also maintains that there is no support in the record that the management principals had knowledge about any claimed disability, and therefore they could not have acted with the requisite intent. (Def.'s Mot. for Summ. J. at 9.) "[I]t is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant. . . ." *Geraci v. Moody–Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996). Given Plaintiffs' clarification at oral argument that they are not pursuing a Rehabilitation Act claim based upon actual disability, but under a "regarded as" disabled theory, the parties' discussion of the extent of Defendant's knowledge as to Plaintiffs' claimed disabilities is irrelevant.

[19] To the extent Plaintiffs claim they were subjected to a hostile work environment on account of their perceived disabilities, the Second Circuit has not yet determined whether such claim is cognizable under the Rehabilitation Act. *See Dollinger v. New York State Ins. Fund*, No. 16-4068-CV, 2018 WL 832904, at *3 (2d Cir. Feb. 13, 2018) ("We have not yet decided whether hostile-work-environment claims are cognizable under the ADA); K*elly v. New York State Office*

**B. Retaliation**

A retaliation claim requires plaintiffs to show that: 1) they engaged in protected activity; 2) the employer was aware of that activity; 3) they suffered a materially adverse action; and 4) there was a causal connection between the protected activity and the adverse action. *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012).

Defendant argues Plaintiffs cannot establish that they engaged in protected EEO activity, and that even if they could, there is no evidence raising an inference that their treatment was motivated by retaliatory animus. For the reasons that follow, the Court finds that Plaintiffs have not presented evidence that they engaged in protected activity, and it therefore does not reach the issue of Defendant's motivation.

Protected activity under the anti-discrimination statutes are actions taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (emphasis added); *see* 42 U.S.C. § 2000e–3(a). A communication is protected EEO activity only if it points out illegal discrimination against particular individuals or discriminatory practices by the employer. *Manoharan v. Columbia Univ. Coll. Of Physicians & Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988).

Plaintiffs assert that the specific complaints they made constitute protected activity, either individually, or jointly, spefically: 1) the Form 3971 given by Hatch to Litke on January 8, 2015; 2)

---

*of Mental Health*, 200 F. Supp. 3d 378, 399 (E.D.N.Y. 2016) (recognizing Second Circuit had not spoken on this issue, the court assumed without deciding "that a hostile work environment claim is actionable under the ADA, and, therefore, is also actionable under the Rehabilitation Act.") Regardless of this uncertainty, Plaintiffs lack any evidence that Defendant perceived them as disabled or created hostile work conditions because of such a perception.

the Joint Complaint co-authored by Plaintiffs, dated February 20, 2015; and 3) Hatch's Reply to Litke's Letter of Warning, dated January 30, 2015. Defendant addresses only the Joint Complaint.

Plaintiffs correctly urge that even informal complaints to supervisors can constitute protected activity. (Pl.'s Opp'n at 23 (citing *Martin v. State University of N. Y*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010)).) Defendants do not claim to the contrary—only that Plaintiffs' Joint Complaint (and the other two documents) do not refer to or imply unfavorable treatment on the basis of disability.

While the Joint Complaint alleges "daily bullying, harassment, humiliation, intimidation and demeaning aggression" by Litke, Plaintiffs admit that it makes no mention of discrimination or harassment on any protected basis. (Hatch Tr. at 76:12-21; Henderson Tr. at 86:7-21.) The email from James Bachteler transmitting Plaintiffs' Joint Complaint to Defendant is identified as as a "Hostile Workplace Compliant [sic]," but his nomenclature does not make the Joint Complaint Plaintiffs' protected activity. Similarly, Hatch's indication on her Form 3971 requesting 1.5 hours of leave of a "hostile work environment for the past year" does not put Defendant on notice that she is complaining of disability discrimination. A work environment may be hostile for many reasons which are not prohibited by law, and thus without more, simply complaining that a workplace environment is hostile does not render a complaint protected antidiscrimination activity.

Neither the Form 3971, the Joint Complaint, nor Hatch's responsive letter make any mention of discrimination, nor can they otherwise be understood as protesting *discriminatory* behavior specifically, as opposed to simply complaining of perceived harsh workplace conditions. Plaintiffs' three identified complaints thus do not constitute protected activity under the anti-

retaliation laws and accordingly Plaintiffs cannot prevail on their retaliation claims. *See Cook v. CBS, Inc.*, 47 Fed. Appx. 594, 596 (2002).

### C. Age Discrimination under the ADEA

Plaintiffs allege age discrimination based upon theories of hostile work environment as well as disparate treatment. Under either theory, Plaintiffs must demonstrate that the adverse actions or hostile work environment occurred on account of their age.

To establish a prima facie case of hostile work environment based on age an employee must show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's age. *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 260 (E.D.N.Y. 2012) (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).[20] Employer motivation based on protected status is what distinguishes a generically unfair or unpleasant workplace from one that is prohibited under law. Every unfavorable employment circumstance is not a proxy for discrimination; indeed, reasons can be "non-discriminatory but unbecoming or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1337 (2d Cir. 1997).

A prima facie disparate treatment claim requires that a plaintiff make a showing that he or she has membership in a protected class, qualification for his or her position, suffered an adverse

---

[20] Defendant does not dispute that Plaintiffs have met their burden with respect to the first two elements.

employment action, and that the adverse employment action occurred under circumstances that support an inference of age discrimination. *Galabya v. New York City Board of Education*, 202 F.3d 636, 639 (2d Cir. 2000). The employee must proffer evidence from which it can reasonably be inferred that his or her age was the "but for" cause of the challenged adverse action, i.e., that it would not have occurred absent age-based animus. *See Gross v. FBL Financial Srvcs, Inc.*, 557 U.S. 167, 179 (2009); *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 167 (E.D.N.Y. 2015) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014)).

Plaintiffs rely on the same facts for their disparate treatment and hostile work environment claims. Defendant's sole challenge on summary judgment to Plaintiffs' ADEA claims is that Plaintiffs' age cannot be shown to be the "but-for" cause of the hostile work environment or the adverse actions Plaintiffs suffered, including their forced retirements.

Plaintiffs admitted at their depositions that Litke and the other principals have not made any remarks showing age animus and they do not claim to have other direct evidence of discriminatory intent based on age. (Hatch Tr. at 15:1-15; Henderson Tr. at 35:17-36:11.)

To support an inference of discriminatory animus Plaintiffs point to Cullen's testimony that he persuaded Litke not to pursue further discipline, aside from the Letter of Warning, against Henderson for irregular attendance, apparently believing that further discipline would be pointless, as he anticipated that Henderson would soon retire. (Cullen Tr. at 72:5-13.) Plaintiff maintains that this is significant because Henderson had not informed anyone he was intending to retire and therefore this supports an inference that "plaintiffs' respective ages may well have been the real reason behind the . . . discriminatory and disparate treatment they received at the hands of USPS's management." (Pl.'s Opp'n at 30.) However, mere speculation is not sufficient, and Plaintiffs fail to provide evidence from which reasonable fact finders could link Cullen's

perception that Henderson would soon retire to any adverse employment action, and thus this remark does not support an inference of age discrimination. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (noting that courts "must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture," explaining that "[a]n inference is not a suspicion or a guess" but rather "is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist" (alterations and internal quotation marks omitted)).

Plaintiffs also claim to have observed Litke exhibiting preferential treatment toward the younger Human Resource Specialists within the Unit, and that it was apparent she wanted to get rid of the older workers in favor of younger employees who would draw a lesser salary. (Pl.'s Opp'n at 29.) Plaintiffs fail to identify anything specific in the record supporting Defendant's purported desire to replace them with younger employees, nor any evidence that in fact they were replaced by younger employees, and therefore this assertion is unsupported.

With respect to their claims of preferential treatment, Plaintiffs testified that Litke would take away assignments from the more junior Human Resource Specialists when they were not able to complete them, whereas when Plaintiffs complained that the deadlines Litke was setting for them were unreasonable and that they were completely overwhelmed with projects they could not timely complete, Litke admonished them, threatened them with discipline and instructed them that they simply had to work harder. Plaintiffs were the most senior and thus most experienced employees and Plaintiffs concede that there is nothing unlawful about an employer imposing

higher expectations on the more senior employees than those that are less senior.[21] Thus, without more, this evidence is insufficient to show discriminatory animus.

Plaintiffs also argue that the younger workers were liberally allowed to take annual leave when they requested, but that both Henderson and Hatch were told when they requested leave, it was inconvenient. (Pl.'s Opp'n at 29.) Hatch testified that she observed "Berghuis took a lot of annual leave," but she did not know whether it was annual or sick leave. (Hatch Tr. at 50:12-24.)[22] Henderson testified that in his view younger employees, such as Berghuis, were allowed to take annual leave at will based on the fact that he observed they were gone from the office. (Henderson Tr. at 63:25:64:9.) Plaintiffs point to no specific examples in which they were denied leave, nor comparator employees' leave records, which could show that younger employees were permitted to take more annual leave than Plaintiffs, or were permitted to take it when they wanted.

Finally, Plaintiffs' contention that they were frequently required to stay well beyond their scheduled departure time without the benefit of compensation does not establish that Litke required this of them because of their age. Plaintiffs are unable to show that younger employees were not required to stay late, much less without being compensated—Henderson testified that he and Hatch were the first ones in and first to leave, and therefore he did not know whether Litke also kept other employees past the end of their shifts. (Henderson Tr. at 129:9-15.)

Although by Plaintiffs' accounts the conditions of employment were harsh, causing them to retire early, this is actionable only if Plaintiffs can show this treatment unlawfully occurred

---

[21] Henderson even acknowledged that he and Hatch possessed "the bulk of the knowledge." (Henderson Tr. at 64:6.)

[22] Plaintiffs have not alleged they were treated less favorably than younger employees with regard to sick leave.

because of their age. Here, Plaintiffs have not offered sufficient evidence upon which a reasonable inference can be made that Plaintiffs' age was the but-for cause of their "forced" retirements or any other adverse actions, or that Defendant created a hostile work environment because of their age. Accordingly, Plaintiffs cannot establish a prima facie case of age discrimination, requiring dismissal of Plaintiffs' ADEA claims.

## III.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED. The Clerk is directed to close the case.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this _13_ day of July 2018.